UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 6:24-CR-64-REW-HAI-1 |
| v. | ) | |
| | ) | OPINION & ORDER |
| ROBERT M. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

**I.    Background**

On February 27, 2024, Trooper Matthew Day conducted a traffic stop on a vehicle because of expired registration plates. *See* DE 35-1 (Executed Search Warrant and Supporting Affidavit) at 4.[1] A driver and a passenger were present in the vehicle. *See id.* After obtaining consent to search from the driver, Day found suspected methamphetamine and an "assortment of prescription medication" on the driver's person. *Id.* The search of the vehicle also uncovered "a large amount of suspected fentanyl and prescription medication." *Id.*

Based on this interaction and a subsequent conversation with the occupants, Day applied for a search warrant to search the residence of Defendant Robert M. Smith. *See id.* at 1, 3. Day drafted an affidavit in support of the application. *See id.* at 4. The affidavit (a template, in the Kentucky system) included a heading, stating: "Acting on the information received, Affiant conducted the following independent investigation." *Id.* Under that heading and as grounds for probable cause, Day wrote:

---

[1] The parties do not materially disagree as to the contents of the affidavit. Because the Government's copy of the affidavit is slightly clearer, the Court will rely on that version.

1

> I read the operator and passenger their Miranda Rights and they agreed to speak with me. They explained that they had been fronted the suspected fentanyl from Robert (Pumpkin) Smith. On February 24, 2024, they was fronted half an ounce of fentanyl from Robert (Pumpkin) Smith at his residence on Mill Creek. They estimated there to be approximately ten (10) ounces of fentanyl in a large bag that Robert (Pumpkin) Smith had. They explained that Robert (Pumpkin) Smith sometimes has meth also. Robert (Pumpkin) Smith does have prescription medication, fentanyl 30s, cocaine, and ecstasy. Robert (Pumpkin) Smith keeps the drugs in a man purse on his person, inside the residence or an Ford F-150 in the yard. They estimated that they have seen approximately $75,000 in U.S. currency with Robert (Pumpkin) Smith before. They believed it was in a safety deposit box at a bank. On February 24, 2024, they estimated Robert (Pumpkin) Smith to have approximately $12,000 in U.S. currency. They explained that Robert (Pumpkin) Smith has multiple firearms around the residence and normally keeps a firearm on his person.
>
> They have been purchasing drugs from Robert (Pumpkin) Smith for approximately 18 months. Robert (Pumpkin) Smith deals with them 3-4 times a week and they normally purchase $40 to $60 worth of fentanyl. Robert (Pumpkin) Smith normally cuts the fentanyl down also. Robert (Pumpkin) Smith has told people his drugs have killed people[, h]is brother in law[.] Robert (Pumpkin) Smith has never been out of drugs. They have taken Robert (Pumpkin) Smith on a run to Lexington for drugs before. They estimated that Robert (Pumpkin) Smith took $30,000 in U.S. currency to purchase the drugs. They believe Robert (Pumpkin) Smith has a safety deposit box at People's bank or First National Bank and a small safe in a bedroom of the residence.
>
> The residence that Robert (Pumpkin) Smith resides is on Mill Creek. It is a wooden house and believed to be his father[']s who passed away. A singlewide sets next to the residence. There are several vehicles in the yard, estimated to be twelve (12). A concrete bridge leads to the residence. The residence has a concrete porch. They explained everyone uses the side door and all the deals are done in the kitchen. They identified Robert (Pumpkin) Smith with a photo and provided the phone number[.]

*Id*.

The affidavit listed the intended search location as 400 Mill Creek Road, Jackson, KY 41339 and described it in greater detail as follows:

> Justice Drive turn right onto KY-80, travel approximately 0.6 miles, and take exit 59 onto KY-15. Travel approximately 19 miles, turn left onto KY-1110. Travel approximately 2.7 miles, take a slight right turn onto Markham Fork Road, then travel approximately 1.5 miles, turn right onto Curt Road. Travel approximately 2.0 miles and turn left onto KY-30. Travel approximately 5.2 miles, turn left onto

> Canoe Road. Travel 1.8 miles, turn left onto Mill Creek Road. Travel 0.4 miles and the residence will be on the right across a concrete bridge with a gravel driveway. A singlewide trailer is on the property to the left of the residence. The residence is a wooden home. There are several vehicles in the yard, estimated to be twelve. The residence has a concrete porch with multiple doors leading to the residence.

*Id.* at 3. The affidavit requested to search the residence, any vehicles present, any persons present, and any personal property for, among other things, "illegal drugs," "money," and "weapons/firearms and ammunition used to secure illegal drugs or operations." *Id.*

Breathitt County District Judge Gary Salyers signed and issued the search warrant on February 28, 2024. *See id.* at 2. The executed warrant resulted in the seizure of suspected illegal drugs, drug paraphernalia, firearms, and currency from Smith's residence and from the person of co-defendant Kimberly L. Handy. *See id.* The Government subsequently indicted Smith and Handy, charging Smith with conspiracy to distribute 40+ grams of fentanyl mixture, possession with the intent to distribute 40+ grams of fentanyl mixture, possession of a firearm in furtherance of drug trafficking, and felon possession of a firearm. *See* DE 1 (Indictment).

Smith now moves for a *Franks* hearing based on an allegedly false and material statement asserted in the search warrant. *See generally* DE 33 (Motion). He also moves to suppress the evidence seized and statements made after the execution of the search warrant. *See id.* The Government responded in opposition, *see* DE 35, and Smith replied, *see* DE 36. The matter is ripe for review.

**II.    Analysis**

    **A.    *Franks* Hearing Request**

A *Franks* hearing (originating from *Franks v. Delaware,* 98 S. Ct. 2674) is an "evidentiary hearing on the veracity of the statements in the affidavit" relied upon in a search warrant. *United States v. Frazier*, 423 F.3d 526, 538 (6th Cir. 2005). A defendant is entitled to a *Franks* hearing

3

only if he "1) makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and 2) proves that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Pirosko*, 787 F.3d 358, 369 (6th Cir. 2015) (citation and quotation marks omitted). A supporting affidavit is presumptively valid, *see United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019), and the defendant faces a "heavy burden" to make his "substantial preliminary showing of a knowing falsehood in a search warrant," *see United States v. Shaffer*, 238 F. Supp. 3d 913, 917 (E.D. Ky. 2017) (citation and quotation marks omitted).

Smith's request for a *Franks* hearing stems from one single pre-printed sentence: "Acting on the information received, Affiant conducted the following independent investigation." *See* DE 33 at 3. He argues that this is a false and material statement because Day did not actually conduct an "independent investigation." *Id.* According to Smith, this assertion would "easily . . . confuse[]" a reviewing judge by suggesting that an independent investigation occurred to corroborate the information in the affidavit. *Id.* at 3–4.

Smith has not met his heavy burden to show, even on a preliminary basis, that the affidavit included a false statement. The challenged statement is boilerplate language in the affidavit form used to request search warrants in Kentucky. *See* Commonwealth of Kentucky Court of Justice, *Affidavit for Search Warrant (AOC-335)*, Legal Forms, https://www.kycourts.gov/Legal-Forms/Legal%20Forms/335.pdf. That is, Day did not even draft the sentence himself. A Kentucky state court judge, who undoubtedly reviews warrant requests regularly, would understand the statement to be standard form language, leaving little room for confusion. Similarly, the face of the affidavit makes clear that the information Day relies upon is fully disclosed within the four corners of the document. *See, e.g.*, DE 35-1 at 4 ("I read the operator

4

and passenger their Miranda Rights and they agreed to speak with me. *They* explained that they had been fronted the suspected fentanyl from Robert (Pumpkin) Smith.") (emphasis added); *id.* ("*They* explained everyone uses the side door and all the deals are done in the kitchen.") (emphasis added); *id.* ("*They* identified Robert (Pumpkin) Smith with a photo[.]") (emphasis added). In context, the reviewing judge could plainly see that the information set forth in the affidavit consisted entirely of what Day learned from the subjects of the traffic stop, separate of any independent investigation contemplated.

Moreover, there is no indication that the term "independent investigation" has a specialized meaning or is otherwise defined. Day could have reasonably interpreted the subsequent conversation with the two informants as an "independent investigation," *i.e.*, outside of the confines of the initial search of the vehicle and its persons. In short, the Court does find anything perceivably false about the challenged statement or the affidavit. The Court accordingly denies Smith's request for a *Franks* hearing.[2]

**B.    Probable Cause**

"It is a basic principle of the Fourth Amendment that for a search warrant to issue there must be probable cause." *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) (citing U.S. CONST. amend. IV). When determining whether there is probable cause to issue a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 103 S. Ct. 2317, 2332 (1983). In other words, there must be a "nexus between the place to

---

[2] And, further undercutting any *Franks* basis, omitting the sentence would have no impact on the warrant's probable cause showing. The universe of indicative and inculpatory facts is the same, with or without that verbiage.

be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (citation and quotation marks omitted). In making the probable cause determination, the issuing judge must also consider the veracity, reliability, and basis of knowledge of any informants who supplied information relied upon in the affidavit. *See Gates*, 103 S. Ct. at 2328, 2332.

The "duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Carpenter*, 360 F.3d at 594 (quoting *Gates*, 103 S. Ct. at 2332). The district court screens with great deference to the issuing judge's decision. *See United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001). The exercise is common sense, not hyper-technical, and eschews line-by-line scrutiny in favor of a "totality of the circumstances" approach. *See id.* at 479 (citation and quotation marks omitted). The focus is on what the text includes, not what is missing—or as the Sixth Circuit artfully formulated it: "We ask what good qualities it contains, not 'what it lacks.'" *United States v. Sanders*, 106 F.4th 455, 463 (6th Cir. 2024) (quoting *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000)).

Smith argues that Day's affidavit failed to establish probable cause because Day did not "assert facts showing that he conducted an independent investigation" apart from the statements provided by the informants or otherwise corroborate their statements. DE 33 at 4. Smith also maintains that the affidavit did not demonstrate the informants' reliability, veracity, or basis of knowledge. *See id.*

Smith mischaracterizes or overstates the necessity of independent corroboration in these circumstances. "The additional evidence substantiating an informant's reliability need not be obtained from a source unrelated to the confidential informant—e.g., an independent police investigation or a second confidential informant—but may be any set of facts that support the accuracy of the information supplied by the informant." *United States v. May*, 399 F.3d 817, 824

6

(6th Cir. 2005). To be sure, "in the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration," but "independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause." *Frazier*, 423 F.3d at 532. Other pertinent, perhaps sufficient indicia of reliability may include "a detailed description of what the informant observed first-hand," *United States v. Jackson*, 470 F.3d 299, 307 (6th Cir. 2006), or the police's knowledge of the informant's identity, *see United States v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009).

Admittedly, probable cause here is entirely based on the stop circumstances and statements provided by the passengers detained at the February 27, 2024 traffic stop. While independent corroborating evidence certainly would strengthen the case for probable cause, other indicia of reliability bolster the informants' statements. For one, *both* told Day the same story, substantiating each other's claims. The informants also gave thorough accounts of their longstanding transactions with Smith, describing the following in detail: the amount of fentanyl Smith had on hand during their most recent purchase, the types of drugs he sold, where he typically stored the drugs, how transactions were conducted, a history of sourcing participation, the amount of currency that they observed him possessing, the likely locations of his safety deposit boxes, the location of his residence, and the physical appearance of the residence and its surroundings. *See United States v. Bell*, No. 20-1884, 2022 WL 59619, at *3 (6th Cir. Jan. 6, 2022) ("If, for example, an affidavit lacks information about a confidential informant's trustworthiness, the affidavit can suffice if it gives specific details about the illegal activity or indicates the informant learned of that activity firsthand."). In addition, the informants identified Smith in a photograph and supplied his phone number. Their knowledge was based on their own personal dealings with Smith, which primarily occurred at his residence. *See Dyer*, 580 F.3d at 391 (finding probable cause where the

7

affidavit "aver[red] that the confidential informant witnessed the drug deal on the premises specified in the search warrant"). Drug transactions between Smith and the informants occurred three or four times per week, over an extended period of 18 months. Perhaps most obviously, the drugs found on the driver and in the vehicle had to come from *somewhere* and the identification of the source, with the supporting explanations, carries a certain degree of credibility. The confirmatory information between the two informants, the details given, and their personal knowledge basis make the statements more plausible.

While the passengers' names were not provided in the affidavit, this omission does not vitiate a probable cause finding. "[T]here is no requirement that an informant be named either in the affidavit or the search warrant." *Jackson*, 470 F.3d at 308. Indeed, "[t]he failure to identify the informant to the issuing magistrate is not the failure of a 'minimal requirement,' nor does it make the search warrant presumptively void." *May*, 399 F.3d at 824. Regardless of whether Judge Salyers was aware of the informants' identities, Day knew and directly dealt with them, meaning that the informants faced potential prosecution if they made a false report. *See id.* at 824–25. Those stakes give an added veracity to their statements. Post-*Miranda* warnings, the informants, caught with drugs, also described an ongoing dealing relationship with Smith, one involving drug transactions at his residence three or four times per week for 18 months. That signifies a trafficking conspiracy and/or a high-quantity trafficking relationship, both for the informants and for Smith. The Sixth Circuit generally views an informant's self-incrimination as offering intrinsic marks of credibility. *See United States v. Gamble*, No. 22-5194, 2022 WL 17456308, at *4 (6th Cir. Dec. 6, 2022) ("[T]he driver, in voluntarily speaking with the officers about the drug transaction, made statements against his own penal interest, which further indicated his reliability."). By providing the core information in the affidavit, the informants significantly increased their exposure to

8

prosecution, through accountability for any false reports and their admissions of extensive drug trafficking activities. Making such statements against their own personal interests lends the informants a marked bump in reliability.

Having established that the informants' statements were sufficiently reliable, do those statements, taken together as set forth in the affidavit, evince a fair probability that law enforcement would find drugs or other evidence of criminality in Smith's residence? The Court thinks that they do. The informants told Day that they obtained the fentanyl from Smith at his house—again, the drugs had to come from *somewhere.* Their share was taken from a larger bag, also in Smith's house. The informants reported that Smith never ran out of drugs and that he kept the drugs either on his person or at his residence (including in a truck on the property). *All* drug transactions occurred in the kitchen of the residence. The informants observed Smith with large amounts of currency and believed that he had a safe in a bedroom. They also saw him with multiple firearms in his house. This knowledge was amassed from the 18 months that the informants spent interacting with Smith at his home, multiple times per week. They relayed allegations involving a particular family member of Smith's and that the informants had transported Smith on a drug "run" to Lexington. Finally, the informants identified Smith by photograph and the residence by description and address.

Simply, there was a dense nexus between Smith's residence and the evidence sought—the drugs, the money, and the firearms. The informants relayed that, over the course of their prolonged history with Smith, drugs and firearms were present in the house, and Smith also kept a safe there. The drugs transactions occurred exclusively in Smith's residence. Given the established reliability of the informants, the frequency of their interactions with Smith, and the consistent drug activity that occurred at his residence, the issuing judge had a substantial, non-arbitrary basis for finding

9

probable cause. Thus, the warrant was compliant with the Fourth Amendment, and the Court denies the motion to suppress on this ground.

    C.    **Good Faith Exception**

Even if the Court were to accept Smith's arguments and find probable cause lacking, the search would still be valid under the good faith exception.[3]

"In *United States v. Leon*, the Supreme Court created an exception to the exclusionary rule for evidence 'seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (quoting *United States v. Leon*, 104 S. Ct. 3405, 3411 (1984)). The purpose of the exclusionary rule is to "deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 104 S. Ct. at 3417. Therefore, when a neutral judge issues a warrant, a police officer ordinarily "cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Id*. at 3419. "Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable[,] and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id*. at 3420.

When "an officer conducts a search while lacking a good faith belief in the stated basis for seeking the warrant . . . the officer is at fault for the constitutional violation, warrant notwithstanding, making suppression an effective remedy." *United States v. Neal*, 106 F.4th 568, 572 (6th Cir. 2024) (citing *Leon*, 104 S. Ct. at 3421). One such situation arises when the officer knows, or is reckless in not knowing, that the affidavit supporting the search warrant contains a falsity. *See Leon*, 104 S. Ct. at 3416. Another is when an officer relies on an affidavit that is "so

---

[3] Counsel's gripes about the scope of the exception get no traction in this Court, which is bound by the referenced precedent.

lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *i.e.,* a "bare bones" affidavit. *Id.* at 3416, 3421 (citation and quotation marks omitted). For that, the Circuit previously summarized the rubric as follows:

> An affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a "bare bones" affidavit. *See United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996). A bare-bones affidavit, in turn, is commonly defined as one that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (quoting *Weaver*, 99 F.3d at 1378). Put more simply, a bare-bones affidavit is a conclusory affidavit, one that asserts "only the affiant's belief that probable cause existed." *United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000) (quoting *United States v. Finch*, 998 F.2d 349, 353 (6th Cir. 1993)). It provides nothing more than a mere "guess that contraband or evidence of a crime would be found," *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994), either "completely devoid" of facts to support the affiant's judgment that probable cause exists, *United States v. Carpenter*, 360 F.3d 591, 595–96 (6th Cir. 2004) (en banc), or "so vague as to be conclusory or meaningless." *United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005) (quoting *Carpenter*, 360 F.3d at 596).
>
> In contrast, an affidavit is not bare bones if, although falling short of the probable-cause standard, it contains "a minimally sufficient nexus between the illegal activity and the place to be searched." *Carpenter*, 360 F.3d at 596. If the reviewing court is "able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been"—"some modicum of evidence, however slight"—"between the criminal activity at issue and the place to be searched," then the affidavit is not bare bones and official reliance on it is reasonable. *Laughton*, 409 F.3d at 749–50.

*White*, 874 F.3d at 496–97.

*Sanders*, recently issued by the Sixth Circuit, further refines the rubric for decrying bare bones affidavits. The Court has studied *Sanders* and again "the triumvirate of paradigmatic bare bones affidavits cited in *Leon*." *Sanders*, 106 F.4th at 469. Those cases have informed the bare-bones conception, which is reserved for affidavits "completely devoid of any nexus" or that "merely state[ ] suspicions, or conclusions, without providing some underlying factual circumstances[.]" *Id.* at 468 (citations and quotation marks omitted). Or, as *Sanders* summarized,

11

"bare bones affidavits nakedly assume or vaguely conclude, without attempting to demonstrate why, probable cause has been satisfied." *Id*.

The good faith assessment is distinct from the substantial basis exposition, and *Sanders* clearly directed separation in these analyses. *See id.* at 467–68. As for the skeletal-affidavit test and the bright line for what is and is not bare bones, the Court reiterated: "[W]here an affidavit presents a 'modicum of evidence, however slight," showing '*some* connection, regardless of how remote it may have been' between the 'criminal activity at issue' and location of the search, there exists a 'minimally sufficient nexus' necessitating application of the good faith rule." *See id*. at 469 (citations omitted); *see also Neal*, 106 F.4th at 572 ("A 'minimally sufficient nexus' is not a high bar. All it requires is a 'modicum of evidence, however slight' connecting the illegal activity and the place to be searched."(citation omitted)). Such is the plain demarcation line in this Circuit.

Here, Smith contends that the good faith exception does not apply for two reasons. One, Day "knew or should have known" that his affidavit contained false information. DE 33 at 5. Two, the affidavit was a bare bones affidavit. *See id.* at 5–6. Because the good faith inquiry is a four-corners exercise, *see Laughton*, 409 F.3d at 751, the analysis starts and ends with the affidavit. Having considered Day's affidavit in its entirety, the Court finds that neither proffered basis calls for suppression.

First, as the Court has already found, the affidavit does not include any false statements. This challenge fails at the jump.

Second, the warrant application easily clears the *Leon* hurdle for bare bones affidavits, as Day's affidavit seamlessly and sturdily ties evidence of wrongdoing (drug trafficking and illegal firearm possession) to the place to be searched (Smith's residence). The passengers were found with methamphetamine, an "assortment" of prescription medication, and a "large amount" of

12

fentanyl; the variety and quantity of the substances were plausibly consistent with drug trafficking. *See* DE 35-1 at 4. The informants unequivocally maintained that they recently purchased the fentanyl from Smith at his residence as part of an ongoing supply relationship that existed for over a year with transactions occurring at the residence multiple times weekly. The informants provided specific details explaining where transactions were conducted at the residence, how often those transactions occurred, and where the drugs were kept, not to mention additional information about the presence of firearms and the storage of drug proceeds in the residence. In aggregate, these statements established more than a minimally sufficient nexus, directly connecting evidence of the illegal drugs and firearms to Smith's residence. As explained by *Sanders* in a similar scenario:

> Did the affidavit here entirely fail to connect the evidence of wrongdoing (drug trafficking) to the place to be searched (the apartment)? No. The affidavit detailed three separate ties between [defendant]'s drug dealing and that location. . . . [One of these ties was] the informant's tip that [defendant] was trafficking in drugs from the apartment. In other words, the affidavit did not blindly guess that evidence of drug trafficking would be discovered at the apartment. It had more than "a modicum of evidence." Indeed, much more.

*Sanders*, 106 F.4th at 469. Here too, the affidavit did not "blindly guess" that Smith was trafficking drugs from his residence. To the contrary, the affidavit carried much more than the modicum of evidence needed to assure a reasonable officer, with a warrant neutrally issued and in hand, that probable cause was present.

Therefore, even assuming that the warrant lacked probable cause, the good faith exception would still apply, leaving suppression of the evidence unavailable as a remedy to Smith. No evidence of police misconduct exists to justify the high cost of suppression in this case. Finding a good faith basis for executing the warrant, the Court further denies the motion on this ground.

### III.   Conclusion

For the foregoing reasons, the Court **DENIES** DE 33.

13

This the 18th day of March, 2025.

Signed By:
*Robert E. Wier* REW
United States District Judge